## UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

v.

KENT R.E. WHITNEY

**FILED**
FEB 14 2011
FEB 14 2011
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**11CR0108**

CRIMINAL COMPLAINT

CASE NUMBER: MAGISTRATE JUDGE BROWN

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From in or about  April 2009 through August 2010  in  Cook  county, in the  Northern  District of  Illinois , and elsewhere, defendant did,

knowingly devise and intend to devise a scheme to defraud and to obtain money from investors by means of false and fraudulent pretenses, representations and promises, and of material omissions, and that for the purpose of executing the scheme to defraud, caused the transmission of a wire communication in interstate commerce, namely a December 2, 2009, funds transfer of $15,500 from Schools First Federal Credit Union in California, to an account at Harris Bank in Chicago, Illinois,

in violation of Title  18  United States Code, Section  1343 .

I further state that I am a  Special Agent, Federal Bureau of Investigation  and that this complaint is based on the following facts:

Please see attached affidavit.

Continued on the attached sheet and made a part hereof:  X  Yes  ___ No

_Mark D Stakem_
Mark D. Stakem, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

February 14, 2011                                    at    Chicago, Illinois
Date                                                                  City and State

Geraldine Soat Brown, U.S. Magistrate Judge    _Geraldine Soat Brown_
                                                                         Signature of Judicial Officer

I, Mark D. Stakem, first being duly sworn, state the following under oath:

## INTRODUCTION

1. I am a special agent of the Federal Bureau of Investigation (FBI) and have been so employed for approximately 12 years. I am currently assigned to the Chicago Division of the FBI. As part of my assigned duties, I investigate violations of federal criminal law, including violations of Title 18, United States Code, Sections 1341 (mail fraud) and 1343 (wire fraud).

2. The following statements are based on my personal knowledge, conversations with other law enforcement officers and witnesses, as well as records obtained from various sources. The information contained in this affidavit is submitted for the limited purpose of establishing probable cause to: (1) arrest Kent R.E. Whitney (Whitney); and (2) seize a 2004 Maserati M128 GT Coupe (VIN ZAMBC38A940012387), which constitutes and is derived from proceeds traceable to violations of the wire fraud statute. As such, this affidavit does not contain all of the information that I have gathered during the investigation.

## OVERVIEW

3. Evidence further described below provides probable cause to believe that Whitney engaged in a scheme to defraud investors in commodity options-related investments and used interstate wires in furtherance of the scheme. From mid-2009 through late 2010, Whitney made false representations to investors concerning, among other things: (1) the use of investors' funds; (2) the returns investors could expect, and had made, on their invested funds; and (3) the risks

involved in the investments. Based upon the information gathered to date, I believe there is probable cause to believe that Whitney misappropriated most of the invested funds and concealed his misappropriation by creating and distributing phony account statements and making Ponzi-type payments of returns to investors. As such, this Affidavit is submitted in support of an application for warrants to arrest Whitney, and to seize an automobile purchased with funds misappropriated from at least one investor.

## SPECIFIC FACTS

### Case Initiation and Recent Law Enforcement Actions

4. The CME Group, Inc. (CME) owns and operates the three largest futures exchanges in the U.S. – entities that formerly went by the names Chicago Mercantile Exchange, Chicago Board of Trade, and New York Mercantile Exchange. In late 2010, the CME Group in Chicago informed the FBI that Whitney had been suspended from trading on CME markets for two reasons. First, Whitney put Futures Commission Merchants (futures brokerages firms – also known as "FCMs") at risk by placing options trades in accounts owned or controlled by him without having sufficient margin in the accounts. Second, Whitney solicited funds from multiple investors and did not provide promised returns to the investors and did not return investment principal to the investors. Whitney also continued to trade in other individuals' accounts despite the CME suspension.

5. In November 2010 Whitney was arrested by the Chicago Police Department for forgery, and he was indicted by a Cook County grand jury on those

charges in January 2011. On December 10, 2010, Whitney was charged in a civil regulatory action by the U.S. Commodity Futures Trading Commission in the Southern District of New York. The complaint charged Whitney with engaging in a fraudulent scheme to avoid substantial margin calls when trading options at the Chicago Mercantile Exchange and the New York Mercantile Exchange, and with making false statements to the CME on January 15, 2010. Both the Chicago and New York cases are pending.

### Information Obtained From Whitney's Investors

6. Victim A recently provided information to the FBI stating that he and his son invested $240,000 with Whitney from January 2010 through August 2010, so Whitney could trade options on behalf of Victim A. At the time of Victim A's investment, Whitney was suspended from trading on CME markets, but Whitney did not disclose that fact to Victim A. According to Victim A, Whitney said Victim A's investment would be "held" at Wachovia Bank as collateral for a trading account for Victim A at trading firm FCM A. Whitney also said he would pledge his Chicago Board of Trade (CBOT) membership as collateral to Victim A, and that Whitney would match Victim A's deposit of $240,000. In fact, Victim A's money was not "held" at Wachovia, Whitney never opened a trading account for Victim A at FCM A, Whitney did not have a CBOT seat to offer as collateral, and Whitney did not deposit any of his own funds to match Victim A's deposit.

7. Victim A's investment was not invested in options by Whitney. However, in April and May 2010, Whitney provided Victim A with documents

purporting to be account statements from FCM A. Personnel from FCM A reviewed these account statements and advised the FBI that these statements were fraudulent and that no such account for Victim A existed at FCM A.

8. According to Victim A, Whitney returned to Victim A approximately $44,000 that Whitney claimed to be "returns" from Whitney's trading. A review of Whitney's financial records revealed that in reality these "returns" were not from his trading but rather a return of a portion of Victim A's own funds invested with Whitney. The remainder of Victim A's invested funds were not traded, but were misappropriated by Whitney for personal expenses, for his fiancée and for others associated with Whitney, and, on at least two occasions, for Ponzi-type payments to earlier investors.

9. Victim B recently provided information to the FBI stating that in July 2010, he invested $50,000 with Whitney and one of Whitney's business partners through an entity named Crescent Holdings (Crescent) so Whitney could trade options on behalf of Victim B. At the time Victim B invested, Whitney was suspended from trading on CME markets. The terms of the suspension prohibited Whitney from placing trading orders for himself or for anyone else on any CME market. Whitney did not disclose that fact to Victim B. According to Victim B, Whitney guaranteed a 5% monthly return to Victim B. Whitney told Victim B the only way Victim B would not receive his monthly returns was in the case of a "nuclear war."

10. In the fall of 2010, Victim B received one 5% monthly return payment from Crescent, a second 5% monthly return payment from Whitney and a third 5% monthly return payment in cash. In late 2010, Victim B asked Whitney about his recent arrest by the Chicago Police Department. Whitney acknowledged he had been arrested, and he told Victim B that the U.S. Government was holding $2.5 million of Whitney's investors' funds. My review of Whitney's bank records and trading records revealed that Whitney raised approximately $625,000 from investors during 2009 and 2010 and neither U.S. Government civil nor criminal agencies seized any of Whitney's assets during 2009 or 2010.

11. Victim B's investment was not invested in options by Whitney. Rather, Whitney misappropriated Victim B's invested funds to loan to a business acquaintance, to pay personal expenditures, to pay business expenditures of Crescent, and to make Ponzi-type payments to earlier investors.

12. Victim C recently provided information to the FBI that in October 2009, he invested $40,000 with Whitney and a Whitney acquaintance through a commodity pool named Lone Star Trading Group (Lone Star). Whitney told Victim C that Whitney would earn Victim C a 50% annual return trading options through Lone Star's account at FCM B. On or about October 29, 2009, Victim C's $40,000 check was deposited by Whitney into a Lone Star account at Harris Bank, account number x6849.

13. Whitney had Victim C complete a few account documents from FCM B. However, according to FCM B, no trading account for Lone Star, Whitney,

Whitney's acquaintance or Victim C was ever opened at FCM B. Nonetheless, in December 2009, Victim C received via U.S. Mail a document purporting to be a Lone Star account statement approximately one month after Victim C's investment. This phony account statement showed Victim C's $40,000 investment had grown to $47,250 in just over one month. During an interview with Whitney in November 2010, Whitney admitted to me that he created the phony FCM B account statement and sent it to Victim C.

14. Victim C's invested funds were not invested in options by Whitney. Rather, within a few days, Whitney misappropriated nearly all of Victim C's invested funds by transferring them to Whitney's fiancée's bank account, where the funds were then used to purchase a Maserati Coupe for Whitney's fiancée (as described more fully below).

15. Victim D recently provided information to the FBI that in December 2009, she invested $15,500 from her daughter's college funds in Whitney's Lone Star commodity pool. Whitney had Victim D complete a Lone Star "Subscription Agreement." According to Victim D, on multiple occasions in 2010, Whitney told Victim D he earned approximately 22% to 26% per month trading Victim D's invested funds in Lone Star.

16. My review of Whitney's financial records revealed that Whitney did not use Victim D's investment to trade options. Rather, Whitney immediately misappropriated $10,000 of Victim D's invested funds by making checks payable to his fiancée and to a business acquaintance.

17. Information obtained from victim investors indicated that Whitney communicated with investors, among other ways, through email and correspondence sent through the U.S. Postal Service. For example, Victim C advised law enforcement that he received a Lone Star account statement via the U.S. Postal Service on or about December 4, 2009. This was one of the phony account statements created by Whitney. Whitney also received funds from investors via interstate wire transfer. For example, on or about December 2, 2009, Victim D wire transferred $15,500 from Schools First Credit Union in California, to a Lone Star account at Harris Bank in Chicago, Illinois, for the purpose of making an investment with Whitney. According to an official of Schools First, that financial institution does not have any locations outside the State of California. According to officials of Schools First and Harris Bank, and documents obtained from those financial institutions, the $15,500 wire transfer originated in Santa Ana, California, and was sent via the U.S. Federal Reserve System's Fedwire system to Harris Bank in Chicago, Illinois.

### Information Obtained from Various Banks

18. A number of banks have provided records and information to the government concerning accounts over which Whitney had signatory authority. At Harris Bank in Chicago, Whitney held a personal account, a joint account with his fiancée and a Lone Star account. At Wachovia Bank, Whitney held a personal account. At Bank of Texas, Whitney held a Lone Star account. At Bank of America, Whitney held three personal accounts. Whitney's address of record for the accounts

varied between locations in Illinois, Texas and Florida, states where Whitney has resided at times over the past few years.

19. Whitney has "bounced" several checks in his bank accounts in recent years. In April 2009, Whitney bounced a Harris Bank check at Bank of Texas. Bank of Texas did not suffer a loss as Whitney repaid Bank of Texas. In April 2009, Whitney bounced a Bank of Texas check at Bank of America. Bank of America suffered a loss in excess of $10,000 due to Whitney writing checks from accounts with non-sufficient funds.

20. In November and December 2009, Whitney deposited three worthless TD Ameritrade checks at Harris Bank. The TD Ameritrade account was in Whitney's name and had a zero balance for approximately one year prior to Whitney's deposits. After the deposits of the TD Ameritrade checks, Whitney made withdrawals and transfers between accounts for himself and his fiancée. Ultimately, Harris Bank suffered an approximate $20,000 loss after consolidating balances of multiple accounts on which Whitney was a signatory. As stated above, Whitney was indicted by a Cook County grand jury in January 2011 for this check-kiting activity at Harris Bank.

21. Although review of Whitney's bank records is ongoing, preliminary review of the account activity shows Whitney was using invested funds from new investors to make Ponzi-type payments to earlier investors. The activity also shows that Whitney did not invest most of his client's investments in option trading. Rather, he misappropriated invested funds for his and his acquaintance's benefit.

22. In late May 2010, Whitney and a business acquaintance made more than $300,000 in a single day from trading of futures contracts. Rather than make promised investment return payments owed to Whitney's investors from these profits, Whitney failed to repay any investors to whom he owed money. Instead, Whitney withdrew nearly $200,000 from the trading account and purchased automobiles, and spent tens of thousands of dollars on personal and entertainment expenditures over the next two months.

23. Based on my review of documents and bank records and interviews of Whitney's victims, I believe Whitney raised approximately $625,000 from approximately ten victim investors from April 2009 through August 2010. Since November 2010, Whitney has made numerous promises to repay investors, but my investigation has not revealed that Whitney is regularly employed or that he is financially capable of repaying his victims with legitimate sources of income.

## Property to be Seized

24. My review of financial records of Whitney and his fiancée has revealed that they used funds from an investor to purchase a Maserati Coupe.

    a. Whitney purchased a 2004 Maserati M128 GT Coupe (VIN ZAMBC38A940012387) on November 17, 2009 from Straight Line Auto, Dallas, Texas. Whitney paid for the Maserati with a check drawn on his personal account at Harris Bank, account number x1316, and the check was subsequently dishonored due to non-sufficient funds.

b. On November 2, 2009, Whitney caused the transfer of $39,000 from the Lone Star account at Harris Bank, account number x6849, to Whitney and his fiancée's joint account at Harris Bank, account number x8213. These funds represented nearly all of Victim C's $40,000 investment in Lone Star. Account number x8213 had a balance of approximately $28,600 at the time of this transfer – funds which remained from $100,000 previously transferred from a trading account of another of Whitney's victims in late September and early October 2009. On November 3, 2009, Whitney caused the transfer of $50,000 from account number x8213 to an account in the name of Whitney's fiancée at Lakeside Bank, account number x4559. Account number x4559 had a balance of approximately $6,280 at the time of this transfer. Most of these funds remained in Whitney's fiancée's account number x4559 at Lakeside Bank until December 1, 2009.

c. On December 1, 2009, Whitney's fiancée made a $38,100 transfer from account number x4559 at Lakeside Bank to Straight Line Auto to pay for the Maserati purchased by Whitney a few weeks earlier. At the time of this wire transfer, approximately $47,000 was available for transfer in account number x4559. According to records obtained from the Illinois Secretary of State, Whitney's fiancée then titled the Maserati in her name in Illinois. The Maserati bears license plate IL H942908. The Maserati constitutes and is derived from proceeds traceable to violations of the wire fraud statute.

25. Based upon the information set forth above, there is probable cause to believe that Kent R.E. Whitney knowingly devised and intended to devise a scheme to defraud and to obtain money from investors by means of false and fraudulent pretenses, representations and promises, and of material omissions, and that for the purpose of executing the scheme to defraud caused the transmission of a wire communication in interstate commerce, namely the December 2, 2009, funds transfer of $15,500 from Schools First Federal Credit Union in California, to an account at Harris Bank in Chicago, Illinois, in violation of Title 18, United States Code, Section 1343. Further, there is probable cause to believe that the 2004 Maserati Coupe is subject to seizure and forfeiture civilly pursuant to 18 U.S.C. § 981(a)(1)(c) and 981(b).

Mark D. Stakem, Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN TO before
me this 14th day of February, 2011

Geraldine Soat Brown
United States Magistrate Judge