UNITED STATES DISTRICT COURT        **JUDGE KENDALL**
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION                    MAGISTRATE JUDGE
                                   GERALDINE SOAT BROWN

UNITED STATES OF AMERICA        )
                                )       No. **11 CR 0108**
                                )
                                )
        v.                      )       Violations: Title 7, United States
                                )       Code, Section 13(a)(1); Title 18,
                                )       United States Code, Section 1343
                                )
KENT R.E. WHITNEY               )
                                )       **FILED**
                COUNT ONE               Mar 16, 2011
                (Wire Fraud)            MAR 16 2011

The SPECIAL MARCH 2010 Grand Jury charges:
                                        MICHAEL W. DOBBINS
1.      At times material to this indictment:   CLERK, U.S. DISTRICT COURT

        a.      The Commodity Futures Trading Commission ("CFTC") was an

independent federal regulatory agency charged with administering and enforcing the

Commodity Exchange Act ("the Act"), 7 U.S.C. § 1 et seq.

        b.      Options on futures contracts ("options") were traded on contract

markets (commonly known as exchanges and boards of trade) designated pursuant to

the Act by CFTC.  The Chicago Board of Trade ("CBOT") and the Chicago Mercantile

Exchange ("CME") were two such contract markets.  In 2007, the CBOT merged with

the CME and became CME Group, Inc.  Although the CBOT and CME were under

common ownership, they were distinct legal entities with distinct commodity and

options markets, membership classifications, and disciplinary programs.

        c.      Defendant KENT R.E. WHITNEY was registered with the CFTC

as a floor broker, and as an "associated person" of Lone Star Trading Group, Inc. ("Lone

Star").  Lone Star was registered with the CFTC as an introducing broker, and

WHITNEY was its president. WHITNEY also was a member of the CBOT.

d. Beginning on January 28, 2010, WHITNEY was suspended from trading on any CME Group, Inc. market, including the CME and CBOT markets. During that time period, WHITNEY was prohibited from directly or indirectly accessing any CME Group, Inc. market, and from placing options or futures orders, either on his own or someone else's behalf, on any such market.

2. Beginning in April 2009, and continuing through January 2011, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

KENT R.E. WHITNEY,

defendant herein, devised, intended to devise, and participated in a scheme to defraud and to obtain money and property from investors by means of materially false and fraudulent pretenses, representations, and promises, and by means of material omissions, which scheme is more fully described in the following paragraphs.

3. It was part of the scheme that WHITNEY made false representations to investors concerning, among other things, his use of their funds and the returns they could expect to realize, and allegedly already had realized, on their investments with him. WHITNEY failed to disclose to them that, after January 28, 2010, WHITNEY was suspended from placing options orders, either on his own or someone else's behalf, on any CME Group, Inc. market. WHITNEY also misappropriated most of their funds and concealed his misappropriation by creating and distributing phony account statements, and by making Ponzi-type payments of returns to investors. As a result of WHITNEY's misrepresentations and material omissions, he fraudulently obtained

2

approximately $600,000 from approximately ten investors.

4.      It was further part of the scheme that, in October 2009, WHITNEY told Victim A that WHITNEY was forming a commodity pool called Lone Star through which WHITNEY would trade options through Trading Firm A. WHITNEY falsely represented to Victim A that if Victim A participated in the investment, Victim A would receive a 50% annual return on his investment, and that he and WHITNEY would split WHITNEY's trading profits evenly. On or about October 28, 2009, Victim A completed documents to open a joint account with WHITNEY at Trading Firm A. Also on that day, Victim A gave WHITNEY a check for $40,000.

5.      It was further part of the scheme that WHITNEY did not open a trading account for either Victim A or Lone Star at Trading Firm A, but instead misappropriated Victim A's funds for WHITNEY's own use and for the use of others. On or about October 29, 2009, WHITNEY caused Victim A's $40,000 to be deposited into a Lone Star account at Harris Bank in Chicago which WHITNEY controlled, bringing the balance of that account to $40,004. On or about November 2, 2009, WHITNEY caused $39,000 to be transferred from the Harris Lone Star account to another account at Harris Bank that WHITNEY held jointly with Individual A. On or about November 3, 2009, Individual A transferred $39,000 from the joint Harris Bank account to an account held solely in Individual A's name at a different bank. None of Victim A's $40,000 was used to trade on his behalf, or for his benefit.

6.      It was further part of the scheme that on or about December 4, 2009, WHITNEY gave Victim A a phony trading account statement that purported to have

3

been issued by Lone Star. The trading statement falsely showed options trading activity in a CME Group, Inc. market, and falsely showed that Victim A's trading account had a value exceeding $47,000. In fact, WHITNEY had simply misappropriated all of Victim A's money the month before.

7.    It was further part of the scheme that, in September 2009, WHITNEY told Victim B that he was a successful trader of options and commodities, and they discussed Victim B's potential investment of her daughter's college savings with WHITNEY.

8.    It was further part of the scheme that, on or about December 2, 2009, Victim B wire transferred $15,500 from her account at Schools First Credit Union in California to the Lone Star account at Harris Bank in Chicago using wire transfer instructions WHITNEY had provided. Victim B intended the funds to be used by WHITNEY to trade options for Victim B's benefit through Lone Star.

9.    It was further part of the scheme that WHITNEY did not open a trading account for Victim B at Lone Star, but instead misappropriated Victim B's funds for WHITNEY's own use and for the use of others. Victim B's $15,500 wire transfer into the Lone Star account at Harris Bank brought the balance of that account to $16,504. On or about December 2, 2009, WHITNEY caused a check for $5,000 to be written from the Lone Star account to Individual B. On or about December 3, 2009, WHITNEY caused a check for $5,000 to be written from the Lone Star account to Individual A. None of Victim B's $15,500 was used to trade on her behalf, or for her benefit.

4

10.    It was further part of the scheme that WHITNEY returned a portion of investors' own funds to them and misrepresented to the investors that the funds he returned were profits realized from trading options. In January 2010, WHITNEY told Victim C that WHITNEY was a successful options trader, and told Victim C that if he provided funds to WHITNEY, WHITNEY would use the funds to trade options and split the profits evenly with Victim C.

11.    It was further part of the scheme that, on or about January 15, 2010, Victim C gave WHITNEY $50,000 to trade options. On or about February 3, 2010, WHITNEY returned approximately $5,890 to Victim C as purported trading profits. In fact, these purported trading profits were simply Victim C's own money that had been in WHITNEY's personal bank account. Between February 11 and March 2, 2010, Victim C gave WHITNEY $40,000 to trade options. On or about March 4, 2010, WHITNEY returned approximately $9,700 to Victim C as purported trading profits. In fact, these purported trading profits were simply Victim C's own money that had been in WHITNEY's personal bank account. On or about May 5, 2010, Victim C gave WHITNEY $100,000 to trade options. On or about May 11, 2010, WHITNEY returned approximately $14,500 to Victim C as purported trading profits. In fact, these purported trading profits were simply Victim C's own money that had been in WHITNEY's personal bank account.

12.    It was further part of the scheme that on or about April 26, 2010, and on or about May 10, 2010, WHITNEY gave Victim C phony trading accounts statement that purported to have been issued by Trading Firm B. The trading statements falsely

showed options trading activity in an account purportedly held jointly between WHITNEY and Victim C, and falsely showed a balance in the account. In fact, WHITNEY simply misappropriated Victim C's funds, and did not use the funds to trade options, and did not establish an account at Trading Firm B for Victim C.

13.     It was further part of the scheme that, in April 2010, WHITNEY falsely represented to Victim B that her $15,500 investment had increased in value to $24,000 when in fact he had simply misappropriated her money months before. During the meeting WHITNEY did not tell Victim B that he was suspended from placing any options order for himself, or on behalf of someone else, on any CME Group, Inc. market.

14.     It was further part of the scheme that, in June 2010, WHITNEY falsely represented to Victim B that her $15,500 investment had increased in value to just under $28,000. Again, WHITNEY did not tell Victim B that he was suspended from placing any option order for himself, or on behalf of someone else, on any CME Group, Inc. market.

15.     It was further part of the scheme that WHITNEY concealed, misrepresented, and hid, and caused to be concealed, misrepresented, and hidden, the existence of the scheme, the purposes of the scheme, and the acts done in furtherance of the scheme.

16.　　On or about December 2, 2009, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

KENT R. E. WHITNEY,

defendant herein, for the purpose of executing the above-described scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain wirings, signs and signals, namely, a funds transfer of $15,500 from Schools First Federal Credit Union in California, to Harris Bank in Chicago, Illinois;

In violation of Title 18, United States Code, Section 1343.

## COUNT TWO
(Theft of Commodity Trading Funds)

The SPECIAL MARCH 2010 Grand Jury further charges:

1.     The allegations in paragraphs 1 through 14 of Count One of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.     On or about November 2, 2009, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### KENT R.E. WHITNEY,

defendant herein, a person registered and required to be registered under the Act, and an employee and agent of a person registered and required to be registered under the Act, embezzled, stole and with criminal intent converted to his own use and to the use of another person, money and property with a value in excess of $100, which was received by defendant from Victim A in connection with defendant's business;

In violation of Title 7, United States Code, Section 13(a)(1).

8

## COUNT THREE
### (Theft of Commodity Trading Funds)

The SPECIAL MARCH 2010 Grand Jury further charges:

1.      The allegations in paragraphs 1 through 14 of Count One of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.      On or about December 2, 2009, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### KENT R.E. WHITNEY,

defendant herein, a person registered and required to be registered under the Act, and an employee and agent of a person registered and required to be registered under the Act, embezzled, stole and with criminal intent converted to his own use and to the use of another person, money and property with a value in excess of $100, which was received by defendant from Victim B in connection with defendant's business;

In violation of Title 7, United States Code, Section 13(a)(1).

## FORFEITURE ALLEGATION

The SPECIAL MARCH 2010 Grand Jury further alleges:

1.      The allegations in Counts One of this indictment are hereby realleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461(c).

2.      As a result of his violation of Title 18, United States Code, Section 1343, as alleged in Count One,

### KENT R.E. WHITNEY,

defendant herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461(c), any and all right, title, and interest he may have in any property constituting, and derived from, proceeds he obtained directly or indirectly as the result of such violations.

3.      The interests of defendant subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461(c), include the sum of at least $600,000.

4.      If any of the forfeitable property described above, as a result of any act or omission by defendant:

   (a)      cannot be located upon the exercise of due diligence;

   (b)      has been transferred or sold to, or deposited with, a third party;

   (c)      has been placed beyond the jurisdiction of the court;

   (d)      has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c);

All pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

_____

FOREPERSON

_____

UNITED STATES ATTORNEY